UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| LUAY NSAIF, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:17-CV-641-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| THE CHEESECAKE FACTORY, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

When Luay Nsaif began working at The Cheesecake Factory ("TCF") in Louisville, Kentucky, he signed a Mutual Agreement to Arbitrate Claims ("Arbitration Agreement") in which he agreed to arbitrate any claims that he may have against TCF as a result of his employment. Nsaif later sued TCF in Kentucky state court, alleging that TCF discriminated against him based on his race and religion, that TCF created a hostile work environment, and that TCF caused intentional infliction of emotional distress. TCF removed this action and now moves to dismiss the case and compel arbitration. Nsaif's primary argument in response is that since he cannot read or write English, the Arbitration Agreement he signed was both procedurally and substantively unconscionable. Under well-established Kentucky law, however, "one who signs a contract is presumed to know its contents, and . . . if he has had an opportunity to read the contract which he signs is bound by its provisions, unless he is misled as to the nature of the writing which he signs or his signature has been obtained by fraud." *Hathaway v. Eckerle*, 336 S.W.3d 83, 89–90 (Ky. 2011) (quoting *Clark v. Brewer*, 329 S.W.2d 384, 387 (Ky. 1959)). Nsaif had a duty to request that someone read him the contract before he signed it. If he signed

the contract anyway, he is bound by its terms. That is precisely what happened in this case. The Court, therefore, grants TCF's motion to dismiss and compel arbitration.

I. **Factual Background**

When Nsaif began his employment with TCF on August 20, 2013, he received an Arbitration Agreement and signed it. [R. 5, at p. 1] This agreement required Nsaif and TCF to "arbitrate before a neutral arbitrator any and all disputes or claims between [TCF] and [Nsaif] that arise out of or relate to [Nsaif's] . . . employment . . . with [TCF] . . ." [R. 5-1, Ex. A, at. pp.1-2] Pursuant to the Arbitration Agreement, covered claims include ones for "violation of public policy," "infliction of emotional distress," "discrimination," and "[c]laims under any and all federal, state, or municipal statutes, regulations, or ordinances, including but not limited to laws that prohibit discrimination, harassment, or retaliation in employment (*for example*, *those related to or based upon . . . a person's race, sex, religion, national origin, age . . . or being in another protected class*) . . ." *Id.* at p. 3. (emphasis added). Nsaif signed this Arbitration Agreement the day he was hired.

On September 19, 2018, Nsaif sued TCF in Kentucky state court. [R. 1-1] In his complaint, Nsaif brought two claims for discrimination, one claim for hostile work environment, and one claim for intentional infliction of emotional distress, all under Kentucky state law. *See id.* at pp. 6-7, ¶¶ 46 – 70. The hostile work environment Nsaif complains about arises from two interactions with TCF supervisors following Nsaif's complaints over his steady decline in available work hours. *See id.*, at pp. 3-6, ¶¶ 5 - 45. Nsaif alleges he notified his supervisors of the two interactions, but no corrective action was taken. *Id.* As a result, Nsaif alleges he has experienced "shortness of breath, emotional exhaustion, and anxiety due to [his supervisors'] behavior . . ." *Id.* He has not returned to work, though he was never terminated. *See id.*

TCF removed this action from Jefferson County Circuit Court on October 17, 2017 on the basis of diversity jurisdiction. [R. 1] Shortly thereafter, TCF filed a Motion to Dismiss and Compel Arbitration pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(3), or 56.[1] [R. 4; R. 5] Nsaif filed a Response opposing the Motion. [R. 8]

## II. Analysis

### A. Arbitration Standard

In this circuit, "[i]n order to show that the validity of the agreement is 'in issue,' the party opposing arbitration must show a genuine issue of material fact as to the validity of the agreement to arbitrate," a showing that mirrors the summary judgment standard. *Great Earth Cos. v. Simons,* 288 F.3d 878, 889 (6th Cir. 2002). Therefore, district courts in Kentucky evaluate a motion to compel arbitration as one for summary judgment under Fed. R. Civ. P. 56(c). *See Freeman v. Easy Mobile Labs, Inc.*, No. 1:16-CV-00018-GNS, 2016 WL 4479545, at *1 (W.D. Ky. Aug. 24, 2016) (citing *Arnold v. Rent-a-Center, Inc.*, No. 11-18-JBC, 2011 WL 1810145, at *2 (E.D. Ky. May 12, 2011) ("This court will treat the motion to compel arbitration as one for summary judgment ....")); *Weddle Enters., Inc. v. Treviicos-Soletanche, J.V.*, No. 1:14CV-00061-JHM, 2014 WL 5242904, at *2 (W.D. Ky. Oct. 15, 2014) ("A motion to dismiss based on the existence of a valid arbitration agreement is not evaluated under the usual Fed. R. Civ. P. 12(b)(6) standard. Instead, courts apply the standard applicable to motions for summary judgment.") (internal citation omitted) (citation omitted). "In order to show that the validity of the agreement is in issue, the party opposing arbitration must show a genuine issue of material

---
[1] The defendant alleges that "courts within the Sixth Circuit, and circuits themselves are split on which Federal Rule of Civil Procedure is the proper vehicle for a motion to dismiss based on the existence of an arbitration agreement." [R. 5, p. 3]

fact as to the validity of the agreement to arbitrate." *Great Earth Cos.*, 288 F.3d at 889. (internal quotation marks omitted) (citation omitted).

### B. FAA Overview

The Federal Arbitration Act ("FAA") was enacted "to ensure judicial enforcement of privately made agreements to arbitrate." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219 (1985). The statute "embodies [a] national policy favoring arbitration . . ." *Richmond Health Facilities v. Nichols*, 811 F.3d 192, 195 (6th. Cir. 2016) (citing *Seawright v. Am. Gen. Fin. Servs., Inc.,* 507 F.3d 967, 972 (6th Cir. 2007)). The FAA applies to written agreements to arbitrate disputes that arise out of contracts involving transactions in interstate commerce.[2] Under its terms, such agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that a district court *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Byrd*, 470 U.S. at 218 (emphasis in original).

When a party invokes the FAA and asks a federal court to dismiss or stay a case and compel arbitration, the court must determine whether the parties agreed to arbitrate the dispute at issue. *Stout v. J.D. Byrider,* 228 F.3d 709, 714 (6th Cir. 2000). This requires an examination of the contract language in light of the strong federal policy favoring arbitration, resolving any ambiguities in the contract or doubts as to the parties' intentions in favor of arbitration. *Id.*

---

[2] The Federal Arbitration Act ("FAA") applies only to "[a] written provision in any maritime transaction or *a contract evidencing a transaction involving commerce.* " 9 U.S.C. § 2 (emphasis added). In *Allied Bruce–Terminix Companies, Inc. v. Dobson,* the United States Supreme Court had occasion to interpret the phrase "evidencing a transaction involving commerce." 513 U.S. 265 (1995). First, the Court concluded that the word "involving" was the "functional equivalent of 'affecting.' " *Id.* at 273–74. Next, the Court adopted a "transaction in fact" interpretation of the phrase "evidencing a transaction." *Id.* at 277-78. The Court 'read[ ] the Act's language as insisting that the 'transaction' in fact 'involv[e]' interstate commerce, even if the parties did not contemplate an interstate commerce connection." *Id.* at 281.

Courts should engage in the following four-step inquiry: (1) determine whether the parties agreed to arbitrate; (2) determine the scope of that agreement; (3) if federal statutory claims are asserted, the court must consider whether Congress intended those claims to be non-arbitrable; and (4), if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration. *Id.*

    C. **Motion to Compel Arbitration**

        a. **Agreement to Arbitrate**

Arbitration agreements are fundamentally contracts. As such, courts must "review the enforceability of an arbitration agreement according to the applicable state law of contract formation." *Seawright*, 507 F .3d at 972; *see also Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009) ("[S]tate law," therefore, is applicable to determine which contracts are binding under § 2 and enforceable under § 3 "if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.") (quoting *Perry v. Thomas*, 482 U.S. 483, 493, n. 9 (1987)).

The Arbitration Agreement in this case states that the parties agree to arbitrate before a neutral arbitrator "any and all disputes or claims . . . that may arise out of or relate to . . .[Nsaif's] employment . . ." [R. 5-1, Ex. A, at. pp.1-2] By its clear terms, the agreement is an arbitration agreement, and both parties signed it. *Id*. at 5. This language reflects that the parties did in fact "agree to arbitrate." *Stout*, 228 F.3d at 715.

Nsaif objects on the basis of unconscionability pursuant to the "Savings Clause" of 9 U.S.C. § 2. [R. 8, at pp. 4-8] He does not develop his § 2 argument in any way, instead focusing

entirely on an argument for procedural and substantive unconscionability, citing state law contract principles. *See id.* However, the Supreme Court of Kentucky has held that

> [p]rocedural, or "unfair surprise," unconscionability "pertains to the process by which an agreement is reached and the form of an agreement, including the use therein of fine print and convoluted or unclear language . . . . [It] involves, for example, 'material, risk-shifting' contractual terms which are not typically expected by the party who is being asked to 'assent' to them and often appear [ ] in the boilerplate of a printed form."

*Schnuerle v. Insight Commc'ns Co., L.P.*, 376 S.W.3d 561, 576 (Ky. 2012) (quoting *Conseco Finance Servicing Corp. v. Wilder*, 47 S.W.3d 335, 343 n. 22 (Ky. App. 2001) (internal citations omitted)). Factors relevant to the procedural unconscionability inquiry include the bargaining power of the parties, "the conspicuousness and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of a meaningful choice." *Id.* (citing *Jenkins v. First American Cash Advance of Georgia, LLC*, 400 F.3d 868, 875–876 (11th Cir. 2005)).

Nsaif does not argue that the Arbitration Agreement at issue included any of these things. The agreement was a stand-alone document, was written in normal-sized font, and used clear language. The agreement also included two sections that were typed conspicuously in all-caps:

**Acknowledgement**

THE PARTIES ACKNOWLEDGE AND AGREE THAT EACH HAS READ THIS AGREEMENT CAREFULLY AND UNDERSTAND THAT BY SIGNING IT, EACH IS WAIVING ALL RIGHTS TO A TRIAL OR HEARING BEFORE A JUDGE OR JURY OF ANY AND ALL DISPUTES AND CLAIMS SUBJECT TO ARBITRATION UNDER THIS AGREEMENT.

. . .

**Knowing and Voluntary Agreement By Staff Member**

I ACKNOWLEDGE. THAT I HAVE CAREFULLY READ, THIS AGREEMENT, THAT I UNDERSTAND ITS TERMS, THAT ALL UNDERSTANDINGS AND AGREEMENTS BETWEEN THE COMPANY

> AND ME RELATING TO THE SUBJECTS COVERED IN THE AGREEMENT ARE CONTAINED IN THIS AGREEMENT, AND THAT I HAVE ENTERED INTO THIS AGREEMENT VOLUNTARILY AND NOT IN RELIANCE ON ANY PROMISES OR REPRESENTATIONS BY THE COMPANY OTHER THAN THOSE CONTAINED IN THIS AGREEMENT ITSELF.
>
> I FURTHER ACKNOWLEDGE THAT I HAVE BEEN GIVEN THE OPPORTUNITY TO AND HAVE BEEN ADVISED TO DISCUSS THIS AGREEMENT WITH MY PRIVATE LEGAL COUNSEL OR REPRESENTATIVE OF MY CHOOSING AND HAVE AVAILED MYSELF OF THAT OPPORTUNITY TO THE EXTENT I WISH TO DO SO.

[R. 5-1, Ex. A, at p. 6] The parties' signatures appear just below these sections. *See id.*

Nsaif's sole argument to support his claim that the Arbitration Agreement is unconscionable is based on the parties' relative bargaining power. [R. 8, at p. 8] In essence, he argues that because he does not speak or write English and typically has his son translate documents, and because TCF knew this, he should not be bound by the terms of the agreement he signed. *Id.*, at pp. 5, 7; Ex. A & B, Affs. Nsaif further argues that because TCF has not offered any evidence that Nsaif understood the document that he signed, it would be unconscionable to enforce the agreement. *Id.* at 9. Thus, he concludes the Arbitration Agreement as a whole is unconscionable. In his view that means the parties did not truly "agree" to arbitrate at all.

When determining whether the arbitration clause itself was validly obtained, "[s]tate contract law . . . governs. . ." *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 393 (6th Cir. 2003). And "[i]t is the settled law in Kentucky that one who signs a contract is presumed to know its contents, and that if he has an opportunity to read the contract which he signs he is bound by its provisions, unless he is misled as to the nature of the writing which he signs or his signature has been obtained by fraud." *Hathaway v. Eckerle*, 336 S.W.3d 83, 89–90 (Ky. 2011) (quoting *Clark v. Brewer*, 329 S.W.2d 384, 387 (Ky. 1959)). That rule has been applied to illiterate persons as

well on the grounds that if they are unable to read, they are negligent if they fail to have the contract read to them. *Brewer*, 329 S.W.2d at 387.

Nsaif does not argue that he was misled by TCF when he signed the Arbitration Agreement. He explains that he "simply could not even comprehend what he was being told to sign." [R. 8, at p. 5] But if he was not misled, then it was his affirmative duty to understand the document before he signed it. *Eckerle*, 336 S.W.3d at 89-90. By his own admission, Nsaif had the means of translating the document at issue. [R. 8, Ex. A & B, Affs.] He chose not to, however, even though it was his duty. He signed the contract anyway. Thus, Nsaif's inability to read English does not mean that the contract signed was unconscionable under Kentucky law. Because the arbitration agreement was not unconscionable, both parties "agreed to arbitrate," and there is no "genuine issue" regarding the validity of the arbitration agreement. Fed. R. Civ. P. 56; *Stout*, 228 F.3d at 714.

### b. Scope of Arbitration Agreement

In analyzing the scope of the Arbitration Agreement, the Court acknowledges the well-established rule that "doubts regarding arbitrability must be resolved in favor of arbitration." *Fazio*, 340 F.3d at 386 (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983), *superseded by statute on other grounds*). The claims at issue here fit squarely within the Arbitration Agreement. Nsaif's state law claims against TCF include claims for state law discrimination, one claim for hostile work environment, and one for intentional infliction of emotional distress. [R. 1-1] The Arbitration Agreement requires Nsaif and TCF to "arbitrate before a neutral arbitrator any and all disputes or claims between [TCF] and [Nsaif] that arise out of or relate to [Nsaif's] . . . employment . . . with [TCF] . . ." [R. 5-1, Ex. A, at. pp.1-2] Pursuant to the Arbitration Agreement, covered claims include "[c]laims for . . . violation of public

policy," "infliction of emotional distress," "discrimination," and "[c]laims under any and all federal, state, or municipal statutes, regulations, or ordinances, including but not limited to laws that prohibit discrimination, harassment, or retaliation in employment (*for example*, *those related to or based upon . . . a person's race, sex, religion, national origin, age . . . or being in another protected class*) . . ." *Id.* at p. 3. (emphasis added). The scope of the agreement covers all the claims at issue.

### c. No Federal Statutory Claims Asserted

As mentioned above, Nsaif asserts only state law claims, not federal claims. Since there are no federal law claims at issue, the Court need not consider whether Congress intended them to be arbitrable.

### d. All Claims Subject to Arbitration

As explained above, all of Nsaif's claims are arbitrable claims. Hence there are no non-arbitrable claims for the Court to consider.

For the reasons set forth above, and with the Court being otherwise sufficiently advised, **IT IS HEREBY ORDERED** as follows:

1. Defendant TCF's Motion to Dismiss and Compel Arbitration [**R. 4**] is **GRANTED**.

2. Plaintiff Luay Nsaif **SHALL** prosecute his claims in accordance with the parties' Arbitration Agreement.

3. The matter is **STAYED** pending further proceedings to enforce any award of the arbitrator.

October 17, 2018

*Claria Storm Boom*

Claria Boom, District Judge
United States District Court

cc:
    Counsel of record